Opinion issued June 7, 2018



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-15-00882-CR

————————————

**GERMAN PEREZ-VASQUEZ, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 405th District Court**
**Galveston County, Texas**
**Trial Court Case No. 13CR0953**

---

## MEMORANDUM OPINION

A jury convicted appellant German Perez-Vasquez of murder, and it assessed punishment at 68 years in prison. *See* TEX. PENAL CODE § 19.02. On appeal, Perez-Vasquez raises seven issues. In his first issue, he contends that the evidence was insufficient to support his conviction. In his next three issues, he

argues that the trial court gave incorrect jury charges during both the guilt-innocence and punishment phases of trial. By his fifth and sixth issues, Perez-Vasquez challenges the legal and factual sufficiency of the evidence to support the jury's negative finding on the issue of sudden passion during the punishment phase. Finally, he contends that the trial court erred by entering an affirmative deadly-weapon finding in its judgment.

We conclude that the evidence was sufficient to support the jury's verdicts at both guilt-innocence and punishment, and the jury charges contained no reversible error. Additionally, the trial court did not err by entering an affirmative deadly-weapon finding in its judgment. Accordingly, we affirm the trial court's judgment.

**Background**

Samantha Escobedo dated the complainant, Erik Calvillo. During or around the end of their relationship, Escobedo began having a sexual relationship with Calvillo's co-worker, appellant German Perez-Vasquez. One night, after spending the evening together socializing at dinner and then later at a nightclub, Escobedo invited Calvillo to her home, where he was ambushed and killed by Perez-Vasquez.

Escobedo pleaded guilty to murder and was sentenced to 15 years in prison. Perez-Vasquez was charged with murder, and the case was tried to a jury. Because this appeal involves an argument about the factual sufficiency of the evidence

2

related to punishment, our summary of the evidence at trial is presented in a neutral light.

A grand jury returned an indictment alleging that Perez-Vasquez murdered Calvillo. In two paragraphs, the indictment alleged that Perez-Vasquez did:

> [¶ 1] . . . intentionally or knowingly cause the death of . . . Erik Calvillo with a router device and/or stabbing and/or cutting [him] with a knife and/or stabbing and/or cutting [him] with a screwdriver and/or striking [him] with an object unknown to the grand jury.
>
> [¶ 2] . . . with intent to cause serious bodily injury to . . . Erik Calvillo, commit an act clearly dangerous to human life that caused the death of said Calvillo, by hitting [him] with a bottle and/or hitting [him] with a router device and/or stabbing and/or cutting [him] with a knife and/or stabbing and/or cutting [him] with a screwdriver and/or striking [him] with an object unknown to the grand jury.

At trial, the State called Calvillo's friend, Jose Cruz, as a witness. Cruz testified about his interactions with Calvillo on the night he was killed. Cruz said that he was out with some friends when Calvillo called him. They met at a food truck outside a bar, and Calvillo said that "he had a problem." Cruz left Calvillo at the bar and drove his other friends home. He then returned to the bar, and he and Calvillo decided to go to the Olympus Club. Before they arrived at the club, Calvillo "found out on his cell phone that his girlfriend had posted something." Calvillo went inside the club, and Cruz stayed outside. Calvillo was ushered out of the club by security. They left and drove to Calvillo's house.

Cruz knew that Calvillo had gotten into a fight at the club. He also knew that Calvillo was upset with his girlfriend and with Perez-Vasquez. Cruz testified that Calvillo was "sad" and "hurt." He also testified that Calvillo talked to numerous people on the phone while the two were at his house. Eventually, Calvillo decided he wanted to go to his girlfriend's house.

Cruz drove Calvillo to Escobedo's house. Before he drove him there, however, Cruz asked Calvillo if "he was carrying a weapon." According to Cruz, Calvillo never had a weapon. Cruz dropped Calvillo off at Escobedo's house. He waited while Calvillo and Escobedo had a conversation in the yard in front of her house. Escobedo told Cavillo to "come on in." Cruz stayed parked in front of Escobedo's house for several minutes. He left around 6:10 a.m. and returned to Calvillo's house. Cruz learned later that week that Calvillo had been killed at Escobedo's house.

Escobedo also testified at trial. Initially, she discussed her relationship with Calvillo. She said that she had been dating him for six to eight months before his death, but she had tried to end the relationship "weeks prior." Escobedo also testified that three or four weeks before Calvillo's death, she had become romantically involved with Perez-Vasquez. Calvillo did not know about her relationship with Perez-Vasquez. Escobedo acknowledged that she pleaded guilty to murder and tampering with evidence. The prosecutor asked Escobedo about

4

statements she had given to the police during the investigation into Calvillo's death. She testified that she had lied "a lot," but she agreed that she would tell only the truth during her testimony.

According to Escobedo, she had invited people to her house to eat oysters on the evening of Calvillo's death. While they were eating oysters, Calvillo, Calvillo's father Rogelio, and Perez-Vasquez showed up at her house, uninvited. Escobedo and Calvillo argued during the oyster party. Afterwards, Perez-Vasquez, Calvillo, and Rogelio left together. Later, Calvillo returned to Escobedo's house, and they argued again. She said that he embarrassed her in front of her friends. Escobedo and her cousin then decided to go dancing. At that time, she had consumed approximately one dozen beers and "four or five" tequila shots. Because of her drinking, the next day she had trouble remembering the rest of what happened that night.

Escobedo and her cousin left for the Olympus Club around midnight. On the way, they stopped by the Rodeo Club because Perez-Vasquez had called and asked Escobedo to pick him up. After they arrived at the Olympus Club, Perez-Vasquez and Escobedo danced. While they were dancing, Calvillo arrived at the club, and he punched Perez-Vasquez in the eye. Calvillo looked "angry and upset." After the altercation, Perez-Vasquez, Escobedo, and her cousin left the club. They returned to Escobedo's house. Perez-Vasquez was quiet during the drive back, and he

appeared to be agitated. Calvillo's truck was parked outside of her house when they arrived. Escobedo's cousin parked a few houses down, and Escobedo and Perez-Vasquez snuck into the house to avoid an altercation. Escobedo's three children were asleep in her bedroom.

By the time they got inside, Calvillo's truck was gone. But as Escobedo closed the door, Calvillo approached the house. He briefly spoke to someone on the phone, and he left. Perez-Vasquez told Escobedo to call Calvillo and try to get him to come back to her house. Escobedo testified that Perez-Vasquez was "angry." "[H]e wanted to fight. He wanted a physical rematch."

Perez-Vasquez gave Escobedo instructions on what to do when Calvillo arrived. He told her to sit Calvillo "on the first couch, not on the first one, on the second one with his back to the hole so that way, you know, he has no access to see what's behind him or who was coming behind him." He also told Escobedo to distract Calvillo and that is when the fight would happen. Escobedo called Calvillo to lure him to the house. When Calvillo arrived and knocked on the door, Perez-Vasquez was hiding in the bathroom.

Once Escobedo sat Calvillo on the couch, Perez-Vasquez came from behind him with a bottle and a tool in his hands. Perez-Vasquez broke the bottle on the back of Calvillo's head. Calvillo, who was unarmed, stood up and started to hit Perez-Vasquez with his hands. Perez-Vasquez asked for help, so Escobedo pushed

6

Calvillo. Perez-Vasquez then got on top of Calvillo, and put his knee on his neck. Perez-Vasquez started hitting Calvillo's head with a Wi-Fi router. Calvillo said, "It's over. Leave me alone. It's over." Perez-Vasquez then grabbed a knife and started cutting and stabbing Calvillo. Perez-Vasquez struck him "lots of time[s]" with the knife. Additionally, he used a screwdriver to stab Calvillo in the stomach. Finally, Escobedo saw Perez-Vasquez dig the knife into Calvillo's head "one last time."

After Calvillo died, Perez-Vasquez moved the body from the living room to a bedroom. Escobedo provided him with laces to bind Calvillo's wrists and a plastic bag, which they put over the body. They tried to mop up the blood. They also painted over blood that was on the walls.

Perez-Vasquez left Escobedo's house to get his truck. Escobedo and Perez-Vasquez discussed dumping the body in Galveston or leaving the state. Instead, they decided to turn themselves in. They agreed to lie to the police by saying that Calvillo was carrying a gun and a knife and that he had threatened Escobedo. Additionally, they agreed to tell the police that Calvillo "had broken the door," that he "grabbed" Escobedo "by force," and that he held a knife to her neck "with a gun on the other side." Perez-Vasquez and Escobedo turned themselves in to the police.

In addition to Cruz and Escobedo, the State called several other witnesses to testify at trial, including police officers and forensic scientists involved in investigating Calvillo's death.

Two police officers who searched Escobedo's house described the location of the body and the blood on the walls. Both officers testified that there was no evidence indicating that someone had attempted to forcibly enter the home.

Another officer testified about his interviews with Perez-Vasquez and Escobedo. The officer described how Perez-Vasquez and Escobedo looked when they turned themselves in. Perez-Vasquez had the beginnings of a black eye and a possible fat lip. He had no other visible injuries.

A forensic pathologist discussed the results of the autopsy. He described how Calvillo's wrists were tied together and a trash bag was over his head. He explained the various stab wounds, blunt force wounds, chopping wounds, and cutting wounds that had been inflicted upon Calvillo's head and body. Calvillo also suffered asphyxia. The pathologist testified that Calvillo's cause of death was blunt force trauma and sharp force trauma to the head. He also testified that stabbing someone with a knife or screwdriver—or striking somebody multiple times with a wireless network router—could cause serious bodily injury or death.

Finally, a forensic scientist who conducted DNA testing on objects collected from Escobedo's house testified about the results of her tests. Perez-Vasquez could

not be ruled out as a DNA contributor on several objects, including a screwdriver and knife. His DNA was found under Calvillo's fingernails.

After the State rested, the defense called two witnesses during its case-in-chief, Perez-Vasquez and his brother Jimmi.

Perez-Vasquez testified that he went to Escobedo's house for oysters with Calvillo and Rogelio. He said that Calvillo was furious when they left and was giving him "a bad look" in the car. Perez-Vasquez testified that on their way back to Rogelio's house, Escobedo sent him a threatening text message that warned him to take care of himself. He was "very scared." After Calvillo dropped them off, Perez-Vasquez and Rogelio went to the Rodeo Club. Later Escobedo picked up Perez-Vasquez at the Rodeo Club, and they went dancing at the Olympus Club for several hours. Calvillo came to the Olympus Club and punched Perez-Vasquez in the eye. Perez-Vasquez left the Olympus Club with Escobedo and her cousin.

Perez-Vasquez testified that they returned to Escobedo's house and Calvillo's truck was parked in front. Escobedo's cousin dropped them off several houses away. Escobedo had left her keys at the club, so they had to force their way into her house. Perez-Vasquez heard Calvillo and what sounded like other people, getting out of Calvillo's truck. Calvillo walked up to Escobedo's front door, and he used the light of his phone to try to see inside. He left after a few minutes, which allowed Perez-Vasquez and Escobedo to get inside the house. Once inside, Perez-

Vasquez received several calls from Calvillo, but he did not answer. When he called back, Calvillo threatened him. Perez-Vasquez thought Calvillo would kill him.

Later, Perez-Vasquez and Escobedo heard someone kicking the front door. They decided to call 911. Escobedo made the call, but she was unable to complete it. They heard noises that sounded like someone had gotten into the house. Perez-Vasquez said that Escobedo told him to hide. He grabbed a screwdriver and a bottle for protection; he thought Calvillo had come to Escobedo's house with a friend, and that he might have a gun. He was "scared," and he hid in a back room. Calvillo entered and asked Escobedo where Perez-Vasquez was. Perez-Vasquez then heard Escobedo saying, "Don't kill me, Honey." He thought Calvillo was going to kill her.

Perez-Vasquez crawled out of the room where he was hiding. He saw Calvillo grabbing Escobedo by her hair. He intended to knock Calvillo out with a bottle and call the police. He approached Calvillo from behind and hit him with the bottle. Calvillo began acting more aggressively after he was hit with the bottle. Perez-Vasquez realized that Calvillo had a knife in his hand. Calvillo started trying to stab him with the knife, and Perez-Vasquez tried to defend himself with the screwdriver. Perez-Vasquez testified that Calvillo was stronger than he was.

At some point during the struggle, Perez-Vasquez grabbed a wireless router and began hitting Calvillo with it. He could not remember how many times he hit him. Calvillo was threatening to kill them and saying that more people were coming. Escobedo hit Calvillo in the head with something, and Perez-Vasquez was able to get out from underneath him. Calvillo never stopped hitting Perez-Vasquez. Escobedo put a pillow over Cavillo's face.

During the struggle, a phone rang and things started to calm down. Calvillo started "mocking" Perez-Vasquez and Escobedo by saying, "I told you that I wasn't alone here." Escobedo told Perez-Vasquez, "We have to get the children out of here. Finish him, or I will finish him." Perez-Vasquez testified that he felt desperate, and he grabbed the knife and started hitting Calvillo in the head because he thought other people were coming into the house. Eventually, Calvillo stopped moving. Perez-Vasquez told Escobedo to call the police, which she did, but she hung up the phone because she did not want to traumatize her kids.

Jimmi Perez-Vasquez testified on behalf of his brother during the guilt-innocence phase of trial. He testified that Calvillo called him the day that he was killed. Calvillo was "aggressive, angry" on the phone and looking for Jimmi's brother, whom he had "just found" with Escobedo. Calvillo threatened that he and some friends were going to retaliate against Perez-Vasquez. Jimmi called his brother, who confirmed that Calvillo had punched him and said he was "coming

back." Jimmi did not tell his brother about Calvillo's threats. He testified that he was concerned for his brother's safety, but he did not call the police because he did not know where Escobedo lived. The next day, Jimmi saw his brother at the house they shared. Perez-Vasquez took a bath, and then Jimmi told him to "turn himself in."

Before closing arguments, the trial court held a charge conference. Defense counsel requested an instruction on defense of property, which the trial court denied. Defense counsel did not request an accomplice-witness instruction. The jury charge did not include a special issue or question about whether Perez-Vasquez used a deadly weapon during the commission of the offense.

The jury found Perez-Vasquez guilty of murder as alleged in the indictment.

During the punishment phase, the State offered all of the evidence from the guilt-innocence phase, and it then rested. Several people testified on Perez-Vasquez's behalf during the punishment phase, including his father, mother, brother, and wife. They discussed many of Perez-Vasquez's good qualities, including his parenting ability. Perez-Vasquez also testified during punishment.

In the punishment-phase jury charge, the trial court defined "sudden passion" and "adequate cause." It instructed the jury that if it believed Perez-Vasquez had "proved by a preponderance of the evidence that . . . having committed the offense of murder," he "caused the death of Erik Calvillo under the

12

immediate influence of sudden passion arising from an adequate cause, you must make an affirmative finding as to the special issue." The charge instructed the jury that if it did not believe Perez-Vasquez had proved the special issue by a preponderance of the evidence, it must make a negative finding. The charge included two general unanimity instructions. It stated: "It is your Foreperson's duty to preside at your deliberations . . . and when you have unanimously agreed upon a verdict . . . to certify to your verdict." It also contained another reference to the jury reaching "a unanimous verdict on the punishment." The jury question on the special issue stated:

> Do you find by a preponderance of the evidence that on the occasion in question, at the time of the commission of the offense for which Perez-Vasquez is on trial, he "caused the death of Erik Calvillo while he, . . . was under the immediate influence of sudden passion arising from an adequate cause?

The jury answered the special issue in the negative, and it assessed punishment at 68 years in prison.

The trial court entered a judgment based on the jury findings. Under the "Findings on Deadly Weapon" section of the judgment, the trial court entered, "YES, NOT A FIREARM."

Perez-Vasquez appealed.

13

**Analysis**

Perez-Vasquez raises seven issues on appeal. First, he challenges the sufficiency of the evidence to support his conviction. By his next three issues, he contends that the trial court gave erroneous instructions in the jury charges during both the guilt-innocence and punishment phases of trial. In his fifth and sixth issues, Perez-Vasquez argues that the evidence was legally and factually insufficient to support the jury's negative finding on the issue of sudden passion at the punishment phase of trial. Finally, he argues that the trial court erred by entering an affirmative deadly-weapon finding in the judgment.

## I. Sufficiency of the evidence

Perez-Vasquez challenges the sufficiency of the evidence to support his conviction. He argues that the evidence was insufficient because it showed that he acted in defense of himself or Escobedo, and therefore a reasonable jury could not have rejected that evidence and found him guilty of murder.

We review the sufficiency of the evidence to support a criminal conviction by determining whether, after viewing the evidence in the light most favorable to the verdict, the trier of fact was rationally justified in finding the essential elements of the crime beyond a reasonable doubt. *Brooks v. State*, 323 S.W.3d 893, 902 (Tex. Crim. App. 2010). We measure the evidence "by the elements of the offense as defined by the hypothetically correct jury charge for the case." *Malik v. State*,

953 S.W.2d 234, 240 (Tex. Crim. App. 1997). As the exclusive judge of the facts, the jury may believe or disbelieve all or any part of a witness's testimony. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). We presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we defer to that resolution. *See Brooks*, 323 S.W.3d at 922. On appeal we may not reevaluate the weight and credibility of the record evidence and thereby substitute our own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

A person commits the offense of murder if he "intentionally or knowingly causes the death of an individual," or if he "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." TEX. PENAL CODE § 19.02(b)(1), (b)(2); *see Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd).

Self-defense may be raised against a charge of murder as justification for a defendant's actions and in support of an acquittal. *See, e.g.*, TEX. PENAL CODE §§ 9.31–.33; *Alonzo v. State*, 353 S.W.3d 778, 781–82 (Tex. Crim. App. 2011). "A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force . . . ." TEX. PENAL CODE § 9.31(a). Similarly, a "person is justified in using deadly force against another . . .

15

when and to the degree the actor reasonably believes the deadly force is immediately necessary . . . to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a); *see Smith*, 355 S.W.3d at 145.

Additionally, a person is justified in using force or deadly force to protect a third person if:

(1) under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 [self-defense] or 9.32 [deadly force in defense of person] in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

(2) the actor reasonably believes that his intervention is immediately necessary to protect the third person.

TEX. PENAL CODE § 9.33. A person defending on the grounds of defense of a third person stands in the shoes of the third person. *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986). "So long as the accused reasonably believes that the third person would be justified in using [force] to protect himself, the accused may step in and exercise [force] on behalf of that person." *Id.* Thus, the use of force to protect a third person is justified in any situation in which the third person would be justified in using force to protect himself. *Id.*

A "reasonable belief" in this context is defined as one that would be held by "an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE § 1.07(a)(42). "Deadly force" is force "intended or known by the actor to

16

cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). "Serious bodily injury" is an injury that creates a "substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." *Id.* § 1.07(a)(46).

In a claim of self-defense, "a defendant bears the burden of production," while "the State . . . bears the burden of persuasion to disprove the raised defense." *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003). The defendant's burden of production requires him to adduce some evidence that would support a rational jury finding in his favor on the defensive issue. *See Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). By contrast, the State's "burden of persuasion is not one that requires the production of evidence, rather it requires only that the State prove its case beyond a reasonable doubt." *Zuliani*, 97 S.W.3d at 594 (citing *Saxton v. State*, 804 S.W.2d 910, 913 (Tex. Crim. App. 1991)).

"When a jury finds the defendant guilty, there is an implicit finding against the defensive theory." *Id.* A jury, however, is not permitted to reach a speculative conclusion. *Elizondo v. State*, 487 S.W.3d 185, 203 (Tex. Crim. App. 2016). Nor is it permitted to disregard undisputed facts that allow only one logical inference.

17

*Evans v. State*, 202 S.W.3d 158, 162–63 (Tex. Crim. App. 2006); *Satchell v. State*, 321 S.W.3d 127, 132 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

In reviewing the sufficiency of the evidence when a jury has rejected a claim of self-defense, in addition to considering the essential elements of the offense, we must determine whether, after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact could have found against the appellant on the self-defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914; *see Smith*, 355 S.W.3d at 144–45. When some evidence, if believed, supports a self-defense claim, but other evidence, if believed, supports a conviction, we "will not weigh in on this fact-specific determination, as that is a function reserved for a properly instructed jury." *Reeves v. State*, 420 S.W.3d 812, 820 (Tex. Crim. App. 2013).

Perez-Vasquez contends that the jury could not have found against him beyond a reasonable doubt on the issues of use of deadly force in defense of himself and in defense of a third person. *See* TEX. PENAL CODE §§ 9.32–.33. In support of this argument, he relies upon testimony that indicated that Calvillo was angry throughout the night and made threatening statements about him to other people. He also relies upon his own testimony in which he claimed that Calvillo threatened him earlier in the night, kicked in the door to Escobedo's house and grabbed her by the hair, and was armed with a knife. Perez-Vasquez contrasts this

evidence with that presented by the State. Specifically, he questions the strength and reliability of Escobedo's testimony, which he characterizes as the "central evidence that the State offered in support of [its] contention that" he murdered Calvillo without "legal justification," because she had lied previously and admitted to being intoxicated on the night of the murder.

The jury's decision to reject Perez-Vasquez's defensive claims, however, ultimately hinged on the credibility of the witnesses. "As factfinder, the jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties." *Chambers*, 805 S.W.2d at 461. The statements of a defendant and his witnesses do not conclusively prove a claim of self-defense. *See Sells v. State*, 121 S.W.3d 748, 754 (Tex. Crim. App. 2003); *see also Smith*, 355 S.W.3d at 146.

Perez-Vasquez's testimony and the evidence that suggested he acted in self-defense evidently was not believed by the jury, and thus did not render the evidence in the case insufficient to support the jury's verdict. *See Chambers*, 805 S.W.2d at 461. Although there was some evidence that Perez-Vasquez reasonably believed that deadly force was immediately necessary to protect himself or Escobedo, other evidence supported the contrary position. For example, Escobedo and Cruz testified that Calvillo did not have a weapon when he entered her house. Both of them testified that Escobedo invited Calvillo into the house. Additionally,

19

Escobedo testified that Perez-Vasquez attacked Calvillo from behind while he was sitting on the couch.

Viewing the evidence in the light most favorable to the verdict, a rational factfinder could have found beyond a reasonable doubt against Perez-Vasquez on the issues of self-defense and defense of a third person. *See Saxton*, 804 S.W.2d at 914; *Williams v. State*, 226 S.W.3d 611, 617 (Tex. App.—Houston [1st Dist.] 2007, no pet.). We overrule Perez-Vasquez's challenge to the sufficiency of the evidence.

## II.    Jury charge

In his second, third, and fourth issues Perez-Vasquez challenges the jury charges the trial court gave at the guilt-innocence and punishment phases of trial.

We use a two-step process to review allegations of charge error. *See Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge. *Id.* If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id.* at 744. If the appellant preserved error by timely objecting to the charge, we will reverse if "some harm" resulted from the error. *Id.* at 743. When the defendant fails to object to the charge, we will not reverse based on charge error unless the record shows "egregious harm" to the defendant. *Id.* at 743–44 (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984)); *see also Bluitt v. State*, 137 S.W.3d

20

51, 53 (Tex. Crim. App. 2004); *Starks v. State*, 127 S.W.3d 127, 133 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

### A.  Defense-of-property instructions

In his second issue, Perez-Vasquez argues that the trial court erred by denying a request for defense-of-property instructions in the guilt-innocence jury charge. *See* TEX. PENAL CODE §§ 9.41–.43.

A trial court must charge the jury on any defensive issue raised by the evidence, "regardless of its substantive character." *Brown v. State*, 955 S.W.2d 276, 279 (Tex. Crim. App. 1997). A defendant is entitled to an affirmative defensive instruction on every issue raised by the evidence regardless of whether the evidence is strong, feeble, unimpeached, or contradicted, and even if the trial court is of the opinion that the evidence is not entitled to belief. *Id.* The jury alone decides whether to accept or reject a properly raised defensive theory. *See Sparks v. State*, 177 S.W.3d 127, 131 (Tex. App.—Houston [1st Dist.] 2005, no pet.). In determining whether the testimony of the accused raises an issue of self-defense, the truth of the accused's testimony is not at issue. *Rodriquez v. State*, 544 S.W.2d 382, 383 (Tex. Crim. App. 1977). For a defendant to be entitled to an instruction in the jury charge regarding a defensive issue, there must be evidence, from any source, "on each element of the defense." *Shaw*, 243 S.W.3d at 657.

Perez-Vasquez contends that he was entitled to a jury instruction under sections 9.41, 9.42, and 9.43 of the Penal Code. A person "in lawful possession of land or tangible, movable property is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to prevent or terminate the other's trespass on the land or unlawful interference with the property." *See* TEX. PENAL CODE § 9.41(a). As relevant to the facts of this case, a person is justified in using deadly force against another to protect land or tangible, movable property:

(1) if he would be justified in using force against the other under Section 9.41; and

(2) when and to the degree he reasonably believes the deadly force is immediately necessary:

(A) to prevent the other's imminent commission of arson, burglary, robbery, aggravated robbery, theft during the nighttime, or criminal mischief during the nighttime . . .

. . . and

(3) he reasonably believes that:

(A) the land or property cannot be protected or recovered by any other means; or

(B) the use of force other than deadly force to protect or recover the land or property would expose the actor or another to a substantial risk of death or serious bodily injury.

22

*Id.* § 9.42. A person is justified in using force or deadly force to protect property of a third person if, "under the circumstances as he reasonably believes them to be, the actor would be justified under Section 9.41 or 9.42 in using force or deadly force to protect his own land or property," and:

> (1)    the actor reasonably believes the unlawful interference constitutes attempted or consummated theft of or criminal mischief to the tangible, movable property; or
>
> (2)    the actor reasonably believes that:
>
>> (A)    the third person has requested his protection of the land or property;
>>
>> (B)    he has a legal duty to protect the third person's land or property; or
>>
>> (C)    the third person whose land or property he uses force or deadly force to protect is the actor's spouse, parent, or child, resides with the actor, or is under the actor's care.

*Id.* § 9.43.

No evidence established that Perez-Vasquez had "lawful possession" of Escobedo's property, which would have entitled him to a defense-of-property instruction without requiring him to establish the additional elements of section 9.43, which applies to protection of a third person's property. "Whether someone has lawful possession of property will depend on the nature of the property, the circumstances under which it is held, and the law applicable to such property and such circumstances." *Breakiron v. State*, 79 S.W.3d 103, 106 (Tex. App.—

23

Houston [1st Dist.] 2002, no pet.). Proof of ownership is one of the elements a defendant must establish to be entitled to an instruction solely under section 9.41. *Thompson v. State*, 445 S.W.3d 408, 411 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). "Possession" is defined as "actual care, custody, control, or management." TEX. PENAL CODE § 1.07(a)(39). Perez-Vasquez argues that Escobedo's act of inviting him into her home was sufficient to establish his "lawful possession" of her property. But this evidence does not establish that he had actual care, custody, control, or management of her property. *See id.* Thus, we conclude that he did not have lawful possession of her property. *See id.*; *see also Breakiron*, 79 S.W.3d at 106. As a result, Perez-Vasquez only could have been entitled to a defense-of-property instruction if he produced some evidence to support all of the elements of section 9.43. *See Shaw*, 243 S.W.3d at 657; TEX. PENAL CODE §§ 9.41–.43.

No evidence established that Perez-Vasquez believed Calvillo was attempting to steal Escobedo's property or cause criminal mischief to it. *See* TEX. PENAL CODE § 9.43(1); *see also id.* § 28.03 (criminal mischief); *id.* § 31.03 (theft). Additionally, no evidence established that Escobedo requested protection from Perez-Vasquez, that he had a legal duty to protect her land or property, or that she was his spouse, parent, or child, that she resided with him, or that she was under his care. *See id.* § 9.43(2). Perez-Vasquez contends that a request for protection can

24

be inferred from the evidence that he heard Escobedo begging for her life, but that is not equivalent to a request that he protect her "land or property," *id.* § 9.43(2)(A), and an instruction about deadly force in defense of a person actually was given. *See id.* § 9.33.

Because the evidence did not support all of the required elements, Perez-Vasquez was not entitled to a defense-of-property instruction. *See Shaw*, 243 S.W.3d at 657. As a result, the trial court did not err by refusing to give his requested instruction. We overrule this issue.

## B.    Accomplice-witness instruction

Perez-Vasquez next contends that the trial court erred by failing to instruct the jury that accomplice-witness testimony must be independently corroborated. Article 38.14 of the Code of Criminal Procedure provides: "A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

The State acknowledges that Escobedo was an accomplice witness as a matter of law because she was charged with, and pleaded guilty to, Calvillo's murder at the time of Perez-Vasquez's trial. When a witness is an accomplice-witness as a matter of law, the trial court has an affirmative duty to submit an accomplice-witness instruction to the jury, and the failure to instruct the jury

25

accordingly is error. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011); *See Torres v. State*, 408 S.W.3d 400, 404 (Tex. App.—Houston [1st Dist.] 2012, no pet.). The State concedes that the trial court did not include an accomplice-witness instruction in the jury charge. As a result, we conclude that the trial court erred by failing to exercise its independent duty to instruct the jury that accomplice-witness testimony must be corroborated. *See Torres*, 408 S.W.3d at 404.

Perez-Vasquez has conceded that this issue was not preserved by an objection to the jury charge in the trial court. We therefore review this charge error under the egregious-harm standard of review. *See Almanza*, 686 S.W.2d at 171; *Torres*, 408 S.W.3d at 404. Under that standard, the omission of an accomplice-witness instruction is generally harmless unless the corroborating non-accomplice evidence is "'"so unconvincing in fact as to render the State's overall case for conviction clearly and significantly less persuasive."'" *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002) (quoting *Saunders v. State*, 817 S.W.2d 688, 692 (Tex. Crim. App. 1991)). We consider the extent of any harm "in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Saunders*, 817 S.W.2d at 690 (quoting *Almanza*, 686 S.W.2d at 171).

To measure the sufficiency of the corroborating evidence, we eliminate the accomplice evidence from the record and determine whether the remaining inculpatory evidence tends to connect the defendant to the offense. *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). This evidence may be direct or circumstantial. *Munoz v. State*, 853 S.W.2d 558, 559 (Tex. Crim. App. 1993). In evaluating the non-accomplice evidence, we consider its reliability and the strength of its tendency to connect the defendant to the crime. *Herron*, 86 S.W.3d at 632. Corroborating evidence is reliable if "there is no rational and articulable basis for disregarding it or finding that it fails to connect the defendant to the offense." *Id.* at 633.

"It is well established that appellant's admission or confession, under most circumstances, will be sufficient to corroborate the accomplice witness." *Jackson v. State*, 516 S.W.2d 167, 171 (Tex. Crim. App. 1974); *see Joubert v. State*, 235 S.W.3d 729, 731 (Tex. Crim. App. 2007). Perez-Vasquez admitted that he was involved in, and actively participated in, the killing of Calvillo. Although his version of events differed from Escobedo's, Perez-Vasquez's admission that he was involved in the events was sufficient to corroborate and connect him to the offense. *See Joubert*, 235 S.W.3d at 732. Corroborating evidence need not directly connect a defendant to an offense or be sufficient by itself to establish guilt. *Cathey v. State*, 992 S.W.2d 460, 462 (Tex. Crim. App. 1999). "The evidence must simply

link the accused in some way to the commission of the offense and show that rational jurors could conclude that the evidence sufficiently tended to connect the accused to the offense." *Hernandez v. State*, 454 S.W.3d 643, 648 (Tex. App.–Houston [1st Dist.] 2014, pet. ref'd). In addition to Perez-Vasquez's testimony, other evidence corroborated Escobedo's testimony and linked him to the offense. For example, a forensic scientist testified that Perez-Vasquez could not be ruled out as a contributor of DNA found on evidence collected at the scene.

Perez-Vasquez's testimony and forensic evidence introduced by the State corroborated Escobedo's testimony and connected Perez-Vasquez to the offense. *See Joubert*, 235 S.W.3d at 732. As a result, he did not suffer egregious harm by the trial court's failure to instruct the jury that Escobedo's testimony had to be independently corroborated. *See Herron*, 86 S.W.3d at 632; *Paredes v. State*, No. 01-15-00708-CR, 2017 WL 817170, at *9–11 (Tex. App.—Houston [1st Dist.] Mar. 2, 2017, pet. ref'd) (mem. op., not designated for publication). We overrule this issue.

## C. Sudden-passion instruction

Perez-Vasquez contends that he suffered egregious harm because the punishment-phase jury charge allowed the jury to return a non-unanimous verdict on the special issue of sudden passion. During oral arguments, the State conceded

that the jury charge did not include a proper instruction requiring unanimity as to sudden passion.

If a defendant has been convicted of murder, he may argue at the punishment phase of trial that he caused the death of the complainant while under the immediate influence of sudden passion arising from an adequate cause. TEX. PENAL CODE § 19.02(d); *London v. State*, 325 S.W.3d 197, 207 (Tex. App.—Dallas 2008, pet. ref'd). If the defendant proves this issue in the affirmative by a preponderance of the evidence, the offense is reduced from a first-degree felony to a second-degree felony. TEX. PENAL CODE § 19.02(d); *London*, 325 S.W.3d at 207.

Code of Criminal Procedure article 37.07, section 3(c) provides:

> If the jury finds the defendant guilty and the matter of punishment is referred to the jury, the verdict shall not be complete until a jury verdict has been rendered on both the guilt or innocence of the defendant and the amount of punishment. In the event the jury shall fail to agree on the issue of punishment, a mistrial shall be declared only in the punishment phase of the trial, the jury shall be discharged, and no jeopardy shall attach.

The Court of Criminal Appeals interpreted a prior version of this statute as requiring the jury to agree unanimously on the issue of sudden passion. *See Sanchez v. State*, 23 S.W.3d 30, 34 (Tex. Crim. App. 2000). This court previously has held that the jurors must be unanimous in finding either that the defendant did or did not act under the immediate influence of sudden passion. *Cornett v. State*, 405 S.W.3d 752, 758 (Tex. App.—Houston [1st Dist.] 2013, pet. ref'd). In other

words, if the jury fails to unanimously agree that the defendant did act under the influence of sudden passion, it does not automatically follow that they unanimously agreed the defendant did not act under the influence of sudden passion. If there is no unanimous agreement either way, the trial court must declare a mistrial. *Sanchez*, 23 S.W.3d at 33.

The jury charge, in relevant part, instructed the jury:

. . . if you believe the Defendant proved by a preponderance of the evidence that the Defendant, having committed the offense of murder, caused the death of Erik Calvillo under the immediate influence of sudden passion arising from adequate cause, you must make an affirmative finding as to the special issue, and the punishment range, dependent upon your answer below, would be confinement in the institutional division of the Texas Department of Criminal Justice for any term of not more than twenty (20) years or less than two (2) years. . . . .

But, if you do not believe the Defendant proved by a preponderance of the evidence that the Defendant, having committed the offense of murder, caused the death of Erik Calvillo under the immediate influence of sudden passion arising from adequate cause, you must make a negative finding as to the special issue, and the punishment range, dependent upon your answer below, would be confinement in the institutional division of the Texas Department of Criminal Justice for life or for any term of not more than ninety-nine (99) years or less than five (5) years. . . . .

The charge also included general unanimity instructions.

The jury charge was essentially identical to the one held to be erroneous in *Cornett*. The court did submit a separate verdict form asking the jury if it found by a preponderance of evidence that Perez-Vasquez was under the immediate

influence of sudden passion arising from adequate cause at the time he caused Calvillo's death. In response to the question posed on the special issue form, the jury responded "No, we do not." Even when combined with the sudden-passion and general unanimity instructions, the charge only ensured the unanimity of a finding from the jury that Perez-Vasquez did act under the influence of sudden passion. *See Cornett*, 405 S.W.3d at 760. The response to the special issue did not indicate that the jury also unanimously agreed that Perez-Vasquez did not act under the influence of sudden passion. Because the charge allowed for a non-unanimous finding that Perez-Vasquez did not act with sudden passion, the charge was erroneous.

Because defense counsel did not object to the jury charge, we will reverse only if upon a determination that the error resulted in egregious harm. *Bluitt*, 137 S.W.3d at 53. In considering the question of egregious harm, we ask whether the defendant suffered actual harm from the error, rather than what harm he may have theoretically incurred. *See Cornett*, 405 S.W.3d at 761; *Ellison v. State*, 86 S.W.3d 226, 227 (Tex. Crim. App. 2002). The inquiry is a factual one and requires an analysis of the record as a whole, including "the entire jury charge, the state of the evidence, including contested issues and the weight of the probative evidence, the argument of counsel, and all other relevant information revealed by the record as a whole." *Ellison*, 86 S.W.3d at 227.

31

While the charge did not specifically instruct the jury that it must be unanimous in deciding that Perez-Vasquez did not act under the influence of sudden passion, it also did not specifically direct a negative response to the special issue in the event of nonunanimity. *See Cornett*, 405 S.W.3d at 761. The arguments of counsel at trial did not encourage a finding against Perez-Vasquez based upon a failure to come to a unanimous decision that he acted with sudden passion, rather than on a unanimous decision that he did not. The State's argument focused on evidence that Perez-Vasquez was not under the influence of sudden passion, and did not discuss the unanimity requirement. Similarly, defense counsel argued that the evidence proved there was sudden passion, but he did not address the issue of unanimity.

Taking into account all evidence presented at trial, there was not substantial evidence of sudden passion arising from an adequate cause. Perez-Vasquez did not deny that he killed Calvillo. However, during the guilt-innocence phase he argued the killing was in self-defense and in defense of Escobedo. The jury was properly charged on self-defense and defense of a third party, and it rejected those theories during the guilt-innocence phase by finding Perez-Vasquez guilty of murder.

Defense counsel argued sudden passion during his closing argument in the punishment phase. The Penal Code defines "sudden passion" as "passion directly caused by and arising out of provocation by the individual killed or another acting

32

with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE § 19.02(a)(2). "'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* § 19.02(a)(1). The officer that interviewed Perez-Vasquez following Calvillo's death testified that he did not have any injuries other than a black eye and a busted lip. This evidence indicated that Perez-Vasquez had not been injured significantly by Calvillo. Escobedo testified that the attack was premediated, which contradicted Perez-Vasquez's self-defense theory. *See Hernandez v. State*, 127 S.W.3d 206, 211 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd) (ordinary anger or causes of a defendant's own making are not legally adequate causes).

Finally, the record reflects that after the jury announced its verdict, and in response to a question from the court, the foreperson affirmed that the special issue was decided unanimously.

Taking the entire record into consideration, we conclude that there is evidence indicating that the verdict on the special issue of sudden passion was unanimous. There also is no indication that Perez-Vasquez suffered any actual harm as a result of the error in the jury charge. We overrule this issue.

33

## IV.    Sufficiency of evidence to support sudden-passion verdict

In his fifth and sixth issues, Perez-Vasquez asserts that the evidence is legally and factually insufficient to support the jury's negative finding on the issue of sudden passion at the punishment phase of his trial. *See* TEX. PENAL CODE § 19.02(a), (d).

As noted previously, during the punishment phase of a murder trial a defendant may seek to reduce a murder conviction from a first-degree felony to a second-degree felony by proving by a preponderance of the evidence that "he caused the death under the immediate influence of sudden passion arising from an adequate cause." *See id.* § 19.02(d); *see also Hernandez*, 127 S.W.3d at 211–12 (holding that defendant bears burden at punishment phase to prove issue of sudden passion by a preponderance of evidence).

In reviewing a criminal defendant's legal-sufficiency challenge to a jury's negative finding for an issue on which the defendant bears the burden of proof, we apply the civil standard announced in *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989). *See Smith*, 355 S.W.3d at 147–48; *see also Nolan v. State*, 102 S.W.3d 231, 237–38 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). The *Sterner* standard applies to a legal-sufficiency review of a jury's negative answer on sudden passion during the punishment phase because a defendant bears the

burden to prove sudden passion by a preponderance of the evidence. *See Smith*, 355 S.W.3d at 148.

We examine the record for evidence that supports the negative finding. *Id.*; *Nolan*, 102 S.W.3d at 238. If no evidence supports the negative finding, then we examine the entire record to determine whether it establishes the contrary proposition as a matter of law. *Smith*, 355 S.W.3d at 148; *Nolan*, 102 S.W.3d at 238. In reviewing the record, we defer to the factfinder's determination of the credibility of the witnesses and the weight to give the evidence. *Smith*, 355 S.W.3d at 148.

If the evidence is legally sufficient, then we turn to factual sufficiency. The factual sufficiency standard announced in *Meraz v. State* is appropriate for review of issues, such as affirmative defenses, on which the defendant has the burden of proof by the preponderance of the evidence. *See Meraz v. State*, 785 S.W.2d 146, 154–55 (Tex. Crim. App. 1990); *see also Smith*, 355 S.W.3d at 148. For a factual-sufficiency challenge, the standard of review is whether after considering all the evidence relevant to the issue, the judgment is so against the great weight and preponderance of the evidence so as to be manifestly unjust. *Meraz*, 785 S.W.2d at 154–55. In the factual-sufficiency review of the evidence, we review all of the evidence neutrally, but we do not intrude on the factfinder's role as the sole judge

of the weight and credibility given to any witness's testimony. *Smith*, 355 S.W.3d at 148.

"[E]xcept in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Benavides v. State*, 992 S.W.2d 511, 525 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd).

## A.   Legal sufficiency

"A defendant may not rely on a cause of his own making, such as precipitating a confrontation, to support his argument that he acted out of sudden passion arising from adequate cause." *Smith*, 355 S.W.3d at 149; *see also Naasz v. State*, 974 S.W.2d 418, 420 (Tex. App.—Dallas 1998, pet. ref'd). Escobedo testified that Calvillo punched Perez-Vasquez while they were at a club. After Calvillo punched him, Perez-Vasquez and Escobedo left the club and went to her house. According to Escobedo, after they returned to her house Perez-Vasquez instructed her to invite Calvillo over. He then told her to seat Calvillo on the couch in a specific position. Perez-Vasquez hid in a room whose entrance could not be seen from the location on the couch. After Calvillo arrived, Perez-Vasquez snuck out of the room and hit him in the head with several objects. A fight ensued between the two men, and Perez-Vasquez killed Calvillo by hitting and stabbing him with several different objects. The jury could have concluded based on

Escobedo's testimony that Perez-Vasquez precipitated the confrontation that led to Calvillo's death. *See Smith*, 355 S.W.3d at 149.

Since some evidence showed that Perez-Vasquez precipitated the confrontation that led to Calvillo's death, the evidence is legally sufficient to support the jury's negative finding on the issue of sudden passion. *See id.*; *see also Perez v. State*, 323 S.W.3d 298, 305 (Tex. App.—Amarillo 2010, no pet.). We overrule Perez-Vasquez's fifth issue.

## B. Factual sufficiency

The jury is the sole judge of the weight and credibility given to any witness's testimony. *Smith*, 355 S.W.3d at 149; *Cleveland v. State*, 177 S.W.3d 374, 390–91 (Tex. App.—Houston [1st Dist.] 2005, pet. ref'd). The argument for a sudden-passion finding depended largely on the testimony of Perez-Vasquez and his brother. The jury could have doubted their testimony because Escobedo's testimony contradicted their version of events. Perez-Vasquez testified that Calvillo had a knife when he hit him from behind, but Escobedo said that he did not. Another witness testified that Calvillo did not have a weapon when he went into Escobedo's house. Despite Perez-Vasquez's attempts to diminish Escobedo's testimony because she admitted to giving false statements prior to trial and being drunk on the night Calvillo was killed, the jurors were free to accept her version of

events over his. *See Smith*, 355 S.W.3d at 149; *see also Cleveland*, 177 S.W.3d at 390–91.

Perez-Vasquez never testified that he was angry, upset, or irate when he attacked Calvillo. He only testified that he was afraid of him. A bare claim of fear does not demonstrate sudden passion arising from adequate cause. *Daniels v. State*, 645 S.W.2d 459, 460 (Tex. Crim. App. 1983). "Fear" that rises to the level of "terror" may constitute sudden passion when its cause is such that commonly would produce a degree of terror sufficient to render the mind incapable of cool reflection. *Id.* In his appellate brief, Perez-Vasquez suggests that he became terrified after he hit Calvillo in the head with the bottle because he feared he was going to be stabbed with a knife. But there was evidence that Perez-Vasquez provoked Calvillo by hitting him in the head with the bottle. Further, the jury rationally could have concluded Perez-Vasquez was not telling the truth or that his "terror" was objectively unreasonable. *See Cleveland*, 177 S.W.3d at 391.

Escobedo testified that Perez-Vasquez was angry after the fight. Ordinary anger is not sufficient to support an affirmative sudden-passion finding. *Dukes v. State*, 486 S.W.3d 170, 180–81 (Tex. App.—Houston [1st Dist.] 2016, no pet.); *Hernandez*, 127 S.W.3d at 213–14. A reasonable view of the record indicates that Calvillo's punching of Perez-Vasquez may have been a cause for anger, but it would not drive a person of ordinary temper to violent passion. *See Dukes*, 486

S.W.3d at 181. Further, a rational jury could conclude from the evidence that there was a reasonable opportunity for cool reflection during the significant passage of time between when Perez-Vasquez was punched by Calvillo in the club and when Perez-Vasquez attacked Calvillo. *See McKinney v. State*, 179 S.W.3d 565, 569 (Tex. Crim. App. 2005).

After viewing all of the evidence in a neutral light, we hold that the evidence supporting the jury's failure to find that appellant acted in sudden passion is not so contrary to the great weight and preponderance of the evidence that the verdict is clearly wrong and manifestly unjust. *See Smith*, 355 S.W.3d at 149–50; *Cleveland*, 177 S.W.3d at 390–91. We overrule Perez-Vasquez's sixth issue.

## V.     Deadly-weapon finding

In his final issue, Perez-Vasquez contends that the trial court erred by including an affirmative deadly-weapon finding in the judgment.

Under the law that applied at the time of trial, for a trial court to enter a deadly-weapon finding in the judgment, the trier of fact was required to first make an "affirmative finding" to that effect. Act of May 30, 1977, 65th Leg., R.S., ch. 347, § 1, sec. 3f, 1977 Tex. Gen. Laws 925, 926, *repealed by* Act of May 29, 2015, 84th Leg., R.S., ch. 770, § 3.01, 2015 Tex. Gen. Laws 2320, 2394, eff. Jan. 1, 2017 (current version at TEX. CODE CRIM. PROC. art. 42A.054(c)). The indictment did not specifically allege that Perez-Vasquez used a deadly weapon, and the weapons

it alleged he used (a bottle, a router device, a knife, a screwdriver, "and/or . . . an object unknown to the grand jury") were not all deadly weapons per se. No deadly-weapon special issue was submitted to the jury. But the indictment alleged that Perez-Vasquez caused the death of Calvillo with an object, and the jury found that he was "guilty of murder as alleged in the indictment." As a result, the jury necessarily found that Perez-Vasquez used something that in the manner of its use was capable of causing—and did cause—death. *See Crumpton v. State*, 301 S.W.3d 663, 664 (Tex. Crim. App. 2009).

Relying upon *Guthrie-Nail v. State*, 506 S.W.3d 1 (Tex. Crim. App. 2015), Perez-Vasquez argues that the factfinder had the authority to decline to make a deadly-weapon finding, even when the use of a deadly weapon was a necessary element of the charged offense. Because no special issue was presented to the jury, he thus contends that the trial court could not enter a deadly-weapon finding, despite the jury's guilty verdict.

In *Guthrie-Nail*, the defendant pleaded guilty to conspiracy to commit capital murder. 506 S.W.3d at 2. The indictment in that case alleged that the defendant, "with the intent that capital murder . . . be committed," agreed with another person that "they or one of them would engage in conduct that would constitute the offense" by entering the habitation of the victim, and the other person entered the habitation and shot the victim with a firearm. *Id.* at 2–3. The

40

defendant pleaded guilty to the offense as alleged in the indictment. *Id.* at 3. The trial court found her guilty of the offense as set forth in the indictment, but there was no mention, orally or in writing, about a deadly-weapon finding. *Id.* The judgment reflected "N/A" in the space provided for "Findings on Deadly Weapon." *Id.* Two months after the original judgment the trial judge signed a judgment nunc pro tunc, changing the "Findings on Deadly Weapon" from "N/A" to "Yes, a Firearm." *Id.* The defendant appealed, challenging the trial court's affirmative deadly-weapon finding. *Id.* On appeal, the Court of Criminal Appeals described the issue presented as "whether the trial judge in a bench trial has the discretion to decline to make a deadly-weapon finding, even when the use of a deadly weapon is a necessary element of the charged offense." *Id.* at 4. The Court answered the question "yes," and it remanded the case to the trial court for hearing to determine why it entered an "N/A" in the original judgment. *Id.* at 7.

*Guthrie-Nail* is distinguishable from this case. In *Guthrie-Nail*, the defendant was convicted of conspiracy to commit capital murder, and the indictment in that case did not allege that she actually used a deadly weapon. *See id.* at 2–3. In contrast, in this case the indictment alleged that Perez-Vasquez committed a homicide by hitting, stabbing, cutting, or striking Calvillo using an object.

41

Based on the jury's finding that Perez-Vasquez was guilty of murder as alleged in the indictment, we conclude that the trial court had an adequate basis for entering a deadly-weapon finding in the judgment. *See Crumpton*, 301 S.W.3d at 664. We overrule Perez-Vasquez's seventh issue.

## Conclusion

We affirm the trial court's judgment.


Michael Massengale
Justice

Panel consists of Justices Higley, Massengale, and Lloyd.

Do not publish. TEX. R. APP. P. 47.2(b).